IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>DIGITAL DEVICES SEIZED FROM WILLIAM JAMES PURDY, AS MORE FULLY DESCRIBED IN ATTACHMENT A. | Case No. 2:25-mj-00833 DBP<br><br>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT<br><br>Judge Dustin B. Pead |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jeffrey Chmielewski, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a Special Agent ("SA") with Homeland Security Investigations ("HSI"), assigned to the HSI Salt Lake City, Utah, office. I am concurrently assigned to the Utah Internet Crimes Against Children ("ICAC") Task Force, managed by the Utah Attorney General's Office, and the Child Exploitation Task Force ("CETF"), managed by the Salt Lake City Federal Bureau of Investigation ("FBI"). Prior to being employed by HSI, I was a Colorado State Patrol Trooper for approximately six years. My formal law enforcement training includes completing the Criminal Investigator Training Basic training course and the HSI Special Agent Training program at the Federal Law Enforcement Training Center in Glynco, Georgia. I have received additional training from CETF, ICAC, and other sources related to Child Sexual Abuse Material ("CSAM"), defined

herein as child pornography (as defined in 18 U.S.C. § 2256), and exploitation investigations and specifically to online, undercover enticement.

2.     I have been involved in investigations of federal criminal violations, including those related to the distribution, receipt, and possession of CSAM, child enticement and exploitation, and cybercrime. I have reviewed numerous examples of CSAM. I have become familiar with ways that CSAM is shared, stored, distributed, and/or produced, including the use of various social media websites (Facebook, Instagram, Twitter, Kik, Snapchat, Discord, etc.), messaging platforms and applications, electronic media storage, "cloud" based storage, and peer-to-peer ("P2P") networks. I have also become familiar with jargon or slang terms that people involved in child exploitation use to discuss their activities. I have gathered evidence pursuant to search warrants and have participated in searches of premises, persons, and electronic devices. I have conversed in undercover, online conversations with, and upon arrest, have interviewed persons who possess, view, and distribute CSAM or who seek to commit physical sexual offenses against minors.

3.     As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of previously seized digital devices, as further described in Attachment A.

**PURPOSE OF THE AFFIDAVIT**

4.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of digital devices seized from

William James Purdy ("PURDY")'s person at the time of his arrest on July 24, 2025 (the "SUBJECT DEVICES,") described in Attachment A hereto, for fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 2251 (Production of Child Pornography), 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct); and 18 U.S.C. § 2423(c) (Engaging in Illicit Sexual Conduct in Foreign Places) (collectively, the "SUBJECT OFFENSES"), described in Attachment B hereto.

5.      The statements in this affidavit are based upon my personal observations, my training and experience, and information provided by law enforcement officers assigned to other law enforcement agencies, other special agents, and employees of HSI. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. Thus, I have not included each and every fact known to me concerning this investigation.

## BRIEF SUMMARY

6.      PURDY is an American citizen who has been indicted in the district of Utah for violations of 18 U.S.C. § 2251 (Production of Child Pornography), 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct); and 18 U.S.C. § 2423(c) (Engaging in Illicit Sexual Conduct in Foreign Places).  As set forth in detail below, multiple young boys have disclosed that when PURDY traveled to the Kingdom of Tonga (Tonga) – first as a Mormon missionary in 2017-2018 and then as an educator in 2020-2023 – he sexually molested them or attempted to molest them.  In October 2022, PURDY was indicted in the Kingdom of Tonga on charges related to one of these boys.  PURDY was released pending trial but required to surrender his passport, remain in the Kingdom of Tonga, and regularly report to law enforcement.  However, in March 2023, PURDY obtained a Kingdom of Tonga passport under an assumed identity and

3

fled to Fiji. In Fiji, he obtained an emergency U.S. passport from the U.S. embassy by falsely claiming his U.S. passport had been taken from him. He then returned to the United States. In August 2023, a search warrant was executed on PURDY's home in West Valley, Utah, and child pornography depicting some of these boys was found on his computer. These images appear to have been captured with a hidden camera placed in the bathrooms of the apartments where PURDY lived in Tonga.

7.      At the time of PURDY's initial indictment, he was attending law school in Pittsburgh. He was arrested there on July 24, 2025, and the SUBJECT DEVICES were seized pursuant to his arrest. They are currently located in HSI custody in West Valley City, Utah. While PURDY's digital devices were seized during the search of his home in 2023, there is evidence that he has continued to communicate with at least one of his victims, and as recently as March 2025, sent him gifts, including a Sony PlayStation 5 and personal hygiene products. These were ordered by PURDY from Amazon and shipped directly to the victim. Therefore, there is probable cause to believe that there will be evidence of the SUBJECT OFFENSES on the SUBJECT DEVICES.

## JURISDICTION

8.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS

9.      Based on my training and experience, I use the following terms to convey the following meanings:

a. "Chat" is any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. *See* 18 U.S.C. § 2256(8).

c. "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

d. "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not

5

limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

e.      "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      "Internet Service Providers" are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

h.      "Minor" means any person under the age of 18 years. *See* 18 U.S.C. § 2256(1).

i.      "Mobile application" or "chat application" is a small, specialized program downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

j.      The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic digital media.

k.      "Remote computing service" is defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

l.　　　"Sexually explicit conduct" applies to visual depictions that involve the use of a minor, *see* 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, *see* 18 U.S.C. § 2256(8)(C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. *See* 18 U.S.C. § 2256(2)(A).

m.　　　"Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disk or other electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND ON COMPUTERS AND CHILD EXPLOITATION

10.　　Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the Internet have drastically changed how child pornography is produced and distributed.

11.　　Computers serve four basic functions in connection with child pornography: production, storage, communication, and distribution.

12.　　Child exploiters can upload images or video clips directly from a digital camera to a computer. Once uploaded, they can easily be edited, manipulated, copied, and distributed. Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a

scanner. Once uploaded, they too can easily be edited, manipulated, copied, and distributed. A modem allows any computer to connect to another computer via a telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

13.    The computer's ability to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive or more recently, memory) used in home computers has grown tremendously in the last several years. This storage can store millions of images at very high resolution. Images and videos of child pornography can also be stored on removable data storage media, such as external hard drives, thumb drives, media cards, and the like many of which are small, highly portable, and easily concealed, including on someone's person or inside their vehicle.

14.    Computers, including mobile devices (cellphones), and mobile storage devices are highly capable, with numerous uses, including mapping, communication, instruction, and playing entertainment media and are often expensive. Moreover, these high-capability devices and easily portable upon a person, in bags or luggage, or in motor vehicles, vessels, trains, or airplanes. As such, travelers frequently travel with computers, including mobile devices (cellphones), and mobile storage devices.

15.    The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs such as Kik, bulletin board services, e-mail, "peer-to-peer" ("P2P") file-sharing programs such as LimeWire and eMule, and networks such as eDonkey, Gnutella, ARES, Tumblr, and BitTorrent. Collectors and distributors of child

pornography sometimes also use online resources such as "cloud" storage services to store and retrieve child pornography. Such online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet and can access stored files using any device capable of connecting to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

16.    An Internet Protocol ("IP") address is a unique identifier that electronic devices such as computers, routers, fax machines, printers, and the like use to identify and communicate with each other over a network. An IP address can be thought of as a street address. Just as a street address identifies a particular building, an IP address identifies a particular Internet or network access device. When a user logs on to his/her Internet Service Provider ("ISP"), they are assigned an IP address for the purpose of communication over the network. An IP address can be statically assigned, meaning the IP address does not change from one Internet session to another, or dynamically assigned, meaning a user receives a different IP address each time the user accesses the Internet. An IP address can only be assigned to one user at a time, and ISPs keep records of to whom IP addresses are assigned by date and time. Similarly, cell phone service providers also generally keep IP records that can identify what device (cell phone) utilized the IP address on a certain date and time.

17.    As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of

an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in the computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

### RELATIONSHIP BETWEEN HANDS-ON CHILD SEXUAL OFFENDERS AND CHILD PORNOGRAPHY

18.    I know, based on my training and experience, and based on conversations I have had with others who investigate child exploitation offenses, that people who have a sexual interest in children, including persons who commit hands on sexual offenses against children, and particularly those who travel to commit sexual offenses against children, often collect and trade in child pornography. These persons receive sexual gratification from images and video clips depicting the sexual exploitation of children.

19.    I know that these persons may also use such images and videos to lower the inhibitions of children who they wish to sexually abuse, or to screen several children while seeking a possible victim. Such persons maintain their collections of child pornography in safe, secure, and private locations, such as their residence or vehicle, and on computers and digital storage media under their direct control. Such persons often maintain their collections, which are considered prized possessions, for long periods of time, and prefer not to be without their collections for any prolonged period. In some cases, however, persons with a sexual interest in children have been found to download and delete child pornography on a cyclical and repetitive basis, rather than storing a collection of child pornography indefinitely.

20.     I also know from my training and experience that many people who sexually exploit children often download child pornography from the Internet, and those who collect child pornography, frequently save images and videos of child pornography on their computers and/or transfer copies to other computers and storage media, including cloud storage accounts, external hard drives, thumb drives, flash drives, SD cards, and CDs or DVDs. Moreover, it is common in child exploitation investigations to find child pornography on multiple devices and/or storage media located in suspects' homes, rather than on a single device.

21.     I know based on my training and experience that many social media and messaging platforms, such as Facebook, Instagram, Twitter, Snap Chat, Kik messenger, and others can be directly accessed and used with one's cellular phone. Often, these applications require the user to download the application directly to their phone, which then allows seamless use between the cellular phone and the social media or messaging website.

## STATEMENT OF PROBABLE CAUSE

22.     In or about May 2023, HSI received information that PURDY, an American citizen, had been charged with sexual assault on a child in the Kingdom of Tonga. HSI has been investigating PURDY for offenses related to these allegations, including the SUBJECT OFFENSES.

A.     *PURDY was Indicted on Three Counts of Indecent Assault upon a Child in the Kingdom of Tonga*

23.     On May 25-27, 2023, HSI SA Luke Holloway and United States Diplomatic Security Service (DSS) SA Jeremy Clark traveled to the Kingdom of Tonga to meet with Tonga Police senior officials regarding a Kingdom of Tonga Supreme Court indictment filed against

PURDY. Tonga Police Commissioner Shane McLennan, Deputy Commissioner Tevita Vailea, Chief Superintendent (CS) Kalisi Tohifolau, and Head of Police Prosecution Inoke Finau provided SA Clark and SA Holloway the following details:

24.     Between approximately January 2017, and December 2018, PURDY was in the Kingdom of Tonga serving a 2-year religious mission for the Church of Jesus Christ of Latter-day Saints. Thereafter, PURDY returned to the United States and attended college in Utah. In approximately January 2020, after graduating from college, PURDY returned to the Kingdom of Tonga to teach at a local Baha'i school called Ocean of Light. PURDY also tutored many children in the community, had various Tongan boys living at his residence, and reportedly speaks the Tongan language.

25.     On October 8, 2022, a police complaint was filed to the Tonga police, alleging sexual assault by PURDY on "VICTIM 1,"[1] an 8-year-old boy who PURDY was tutoring.

26.     On October 10, 2022, the Tonga police arrested PURDY on a three-count indictment for indecent assault on a child (VICTIM 1). According to the Kingdom of Tonga Supreme Court Indictment, between May and October 2022, VICTIM 1 was an 8-year-old boy being tutored by PURDY. Counts one and two of the indictment describe how PURDY groped VICTIM 1's penis. Count three describes how PURDY sucked on VICTIM 1's penis. A relative of VICTIM 1 witnessed PURDY inside the residence.

27.     HSI received a copy of the Kingdom of Tonga Supreme Court Indictment against PURDY. Details from the Indictment include:

---

[1] The names of minor victims and their relatives are known to investigators and are omitted to protect the identity of the victims. The names will be provided upon the Court's request. Additionally, minor victims are listed in an order reflective of the ongoing investigation and not in the order they were identified or discovered.

a.    "On or about … the Accused told the Complainant to sit on his lap while the Accused was sitting on a chair at the table at the front veranda where they conducted their lessons."

b.    "The complainant complied. The table was covered with a long black cloth."

c.    "The Accused used his hand to grope the Complainant's nono (what the Complainant refers to as his penis)."

d.    "The Accused told the Complainant not to tell anyone, and the Complainant complied out of fear."

e.    "This repeatedly happed during the Complainant's classes."

f.    "On or about Friday, 7 October 2022, [the relative] had arranged for the Accused to have a private lesson … from 10am to 12pm because it was Teachers Day and there was no school."

g.    "The Accused arrived at [the relative's] house that morning and commenced having lessons with the Complainant."

h.    "During the lesson… the Accused asked the Complainant whether there was anyone else in the house…"

i.    "The Accused then stood at the front door and peeped inside. After this he then told the Complainant to show him where his bedroom is so they can go there and finish his lessons."

j.    "The Complainant led the Accused to his bedroom …"

k.    "When inside the bedroom, the Accused closed the door behind them and

14

told the Complainant to close the louvres of his room as well as the curtains. The Complainant complied."

l.    "The Accused sat down on the floor and told the Complainant to come to him. The Complainant complied."

m.    "The Accused then pulled the Complainant's shorts and underwear down and told the Complainant to take off all his clothes. The Complainant refused. The Accused insisted, but again the Complainant refused."

n.    "The Accused then groped the Complainant's nono [penis] with his hand and then proceeded to suck the Complainant's nono [penis] with his mouth."

o.    "When the Accused was done, he pulled up the Complainant's shorts and underwear and he opened the door."

p.    "The Complainant then walked out and went to the bathroom to wipe himself. The Accused followed behind."

q.    "At this time, [a relative], who was in her bedroom opened her door and saw the Accused inside the house. She was surprised to see him inside the house without her permission."

28.    According to Tonga law enforcement, after orally sodomizing VICTIM 1, PURDY reached out to a relative of VICTIM 1's via Facebook Messenger to apologize to her for the incident and to try to work things out between them. (PURDY later claimed he was apologizing for being in the house without permission, not admitting to sexual assault on VICTIM 1.)



### B. PURDY FLEES TONGA USING AN ASSUMED IDENTITY

29.     October 17, 2022, PURDY was released from custody based on an agreement that he remain in the Kingdom of Tonga for criminal proceedings. As a condition of PURDY's bail, he was required to regularly report to the Central Police station in Nuku'alofa. Further, PURDY's US passport was seized pursuant to court order to prevent him from fleeing the Kingdom of Tonga while the case was still pending. Nevertheless, on March 30, 2023, PURDY fled the Kingdom of

Tonga.

30.    Tonga police investigation revealed that on March 27, 2023, PURDY applied for a Kingdom of Tonga passport using an assumed name. More specifically, law enforcement learned the following:

a.    On March 27, 2023, PURDY assumed the identity of a disabled Tongan citizen to apply for a Kingdom of Tonga passport.[2] In support of his application under the assumed name, PURDY submitted that person's Kingdom of Tonga Birth Registration Certificate - # XXXX53. However, PURDY used his own photograph for the passport.

b.    The photograph provided for the Kingdom of Tonga passport depicts PURDY in a red, black, and white print shirt. Below is a photocopy of the fraudulent Kingdom of Tonga passport application.

---

[2] The name of the assumed identity is redacted to protect said victim's identity. The name will be provided upon the Court's request.

17



c.      On March 29, 2023, PURDY reported to the Central Police station in

Nuku'alofa.

d.      The next day, on March 30, 2023, PURDY went to the international airport

in the Kingdom of Tonga and used the Kingdom of Tonga passport to depart the Kingdom of

Tonga on Fiji Airways flight 212 to Suva, Fiji.

e.      On March 30, 2023, the same day he arrived in Fiji, PURDY appeared in-

person at the U.S. Embassy in Suva, Fiji where he completed a DS-11, Application for a U.S.

18

Passport, and a DS-64, Statement Regarding a Lost or Stolen U.S. Passport Book. In section 21 of the DS-11, PURDY checked the box indicating that his previous passport # XXXXXXX81, issued on November 10, 2016, was stolen. On the DS-64 in section 2, in response to the question, "Explain how your U.S. passport book/card was lost or stolen", PURDY stated, "BOOK: It was taken from me in Tonga." PURDY knowingly omitted the fact that his passport was seized by the Tonga police, pursuant to a court order and agreement that he remain in the Kingdom of Tonga.

        f.      The photograph presented with the DS-11 U.S. Passport Application depicts PURDY in a red, black, and white shirt – the same shirt he is wearing in the photograph on the fraudulent the Kingdom of Tonga passport application.

31.      PURDY received an Emergency Passport (EPDP) that same day and then boarded Fiji Airways flight 870 from Fiji to San Francisco. According to United Airlines, PURDY's ticket for that flight was purchased on March 29, 2023, via the travel website "Expedia." United Airlines also reported that a flight was purchased for PURDY on March 29, 2023, for travel on March 30, 2023, from San Francisco International Airport to Salt Lake City International Airport on United Airlines flight 4805.

32.      On March 31, 2023, PURDY failed to appear for a hearing in the Kingdom of Tonga on the pending child abuse charges. A warrant was issued for his arrest. This warrant is still pending in the Kingdom of Tonga.

33.      After PURDY's flight from Tonga, the Tonga Police informally shared evidence with SAs Holloway and Clark to help locate PURDY, including:

        a.      PURDY's Kingdom of Tonga passport application;

        b.      PURDY's Kingdom of Tonga Departure Card;

c.    PURDY's Kingdom of Tonga Immigration departure record;

d.    Witness statements against PURDY;

e.    Flight manifest from the Kingdom of Tonga to Fiji;

f.    CCTV images from the airport of PURDY's departure from the Kingdom of Tonga; and

g.    Screenshots of the Facebook Messenger chats where PURDY apologized to VICTIM 1's family member.

### C.  *MULTIPLE ADDITIONAL MINOR VICTIMS HAVE BEEN IDENTIFIED*

34.    After PURDY fled Tonga, Tongan law enforcement continued to investigate PURDY.  United States law enforcement also began investigating PURDY. Between 2023 and 2025, Tongan law enforcement identified a number of additional minor victims who disclosed sexual abuse by PURDY.  During some of the interviews, U.S. State Department personnel provided assistance.

35.    In August 2023, a federal search warrant was executed on Purdy's Utah residence, and Purdy's laptop was seized.  During the search of this laptop, law enforcement located approximately 175 images that appeared to be taken surreptitiously in three different bathrooms. Many of the images depicted Tongan boys in various stages of undress. All of these bathrooms have now been identified as bathrooms in Purdy's various Tongan residences. These cameras were deliberately aimed at areas in the bathroom where they were likely to capture the boys naked: one camera was aimed directly at the shower; another was aimed directly at the toilet; a third captured both the shower and toilet. Some depicted the boys showering, while others depicted the boys using the toilet. Their penises were exposed to the camera. In some images, one of the boys was

masturbating.

36.     From May to June 2025, I travelled to Tonga with an HSI child forensic interviewer, as well as other HSI law enforcement personnel and law enforcement with the U.S. State Department. This trip was authorized by the Kingdom of Tonga, pursuant to a formal request made by the United States Government.  During this trip, in coordination with the Tonga police, we conducted child forensic interviews of the victims already identified by Tonga law enforcement, as well as new victims we identified while in Tonga.

37.     We interviewed three minor boys (VICTIMS 8, 9, and 10), who each disclosed PURDY had molested them while serving a mission for the Church of Jesus Christ of Latter-day Saints (the "LDS Church") in Tonga in 2017-2018. Each disclosed that PURDY would give them gifts of money, toys he had shipped from the United States, and candy/snacks.  For example, they remembered PURDY giving gifts of an expensive helicopter toy, a toy gun, a remote-controlled car, and a cellphone. They each disclosed PURDY had performed oral sex on them. One disclosed PURDY had offered to pay the victim to anally sodomize PURDY (he tried and could not), and another disclosed that on multiple occasions, PURDY anally sodomized the victim. These boys were between 7 and 10 years old at the time. They disclosed that this molestation occurred in the missionary residence on the LDS compound and in the LDS church building.

38.     These same victims also disclosed that when PURDY returned to Tonga in 2020 to teach children, before starting his teaching job, PURDY traveled back to their island for Christmas and molested them again. PURDY even paid for one of these victims (VICTIM 9) to travel to a different location in Tonga to live with PURDY. The reason given to VICTIM 9's parents was that PURDY would be in charge of VICTIM 9's education. However, PURDY molested VICTIM 9

again when he arrived at PURDY's residence. When VICTIM 9 later rejected his advances, PURDY kicked VICTIM 9 out of the house. VICTIM 9 was 14 or 15 years old at the time.

39.    Another boy (VICTIM 2) disclosed that PURDY had "catfished" him by posing online as a young, attractive Tongan American female. PURDY sent VICTIM 2 sexually explicit media purporting to be the female and then offered to send VICTIM 2 money through "her friend," PURDY. PURDY picked VICTIM 2 up in his car, ostensibly to take him to get the money. However, PURDY pulled over and parked, and forcibly sexually assaulted VICTIM 2. VICTIM 2 reported this assault to the Tongan police, disclosing that PURDY had fondled VICTIM 2's penis, held him down, and orally sodomized VICTIM 2.  He also said that PURDY recorded this assault on his cellphone.

40.    Numerous additional victims disclosed hundreds of instances of sexual abuse by PURDY while PURDY was living in Tonga as a teacher and a tutor.  The disclosures by the victims and the corroborating evidence from other witnesses, including the victim's parents, is consistent in how PURDY groomed and manipulated these minor victims and their parents. PURDY bought candy, toys, food and drinks, clothing and shoes, cellphones, gaming devices, a ukulele and digital keyboard, birthday gifts, and gave cash to his minor victims. PURDY drove them to stores and took them on trips. PURDY offered to the minor victims' parents to house and feed the minor victims and to tutor them with extra classes. In a June 2025 interview, the mother of Victims 8 and 9 told me that she felt PURDY tricked her into allowing her sons to stay with him and she was ashamed of that. She had no idea that PURDY was sexually abusing her two sons. When PURDY was briefly incarcerated in Tonga for the abuse of VICTIM 1, PURDY lied to his Tongan contacts, claiming that he was being held for alleged physical abuse of a tutoree.

41.     The victims consistently disclosed that PURDY would invite them to his home to play video games, pay for their snacks, etc. At PURDY's invitation, some of the boys moved into PURDY's residence and lived with him. The typical pattern of abuse would be PURDY bringing the boys into his bedroom, pulling down their pants, and telling them to watch pornography on his cellphone while PURDY performed oral sex on them. Further, multiple boys disclosed that for the most of his time teaching in Tonga, PURDY lived in residences with two bathrooms. PURDY would instruct the boys to use the bathroom attached to PURDY's bedroom, even though there was another bathroom available that did not require going through PURDY' bedroom to access it. As set forth above, the evidence on PURDY's computers indicated that PURDY had set up hidden cameras in his bathroom to record the boys in intimate moments such as using the toilet, bathing, and even masturbating.

42.     For example, one boy, VICTIM 3, disclosed that he had been sexually abused by PURDY hundreds of times over the course of approximately three years while he was 14 to 16 years old.  At Purdy's invitation, VICTIM 3 lived in PURDY's residence.  PURDY purchased many items of value for VICTIM 3, including cellphones, gaming consoles, food, clothes, and shoes. PURDY made it clear to VICTIM 3 that in exchange for living with PURDY and getting these gifts, he would have to "do the deal," meaning allowing PURDY to perform oral sex on him.

43.     VICTIM 3 is one of the boys depicted in the CSAM images found on PURDY's laptop during the search of his home in 2023.  VICTIM 3 identified himself in the images, by face and also by tattoos. These images were taken in various bathrooms in the residence where PURDY lived. VICTIM 3 did not know these pictures were being taken. However, he disclosed that once, in one of PURDY's residences, VICTIM 3 found a Bluetooth-enabled hidden camera disguised as

an alarm clock. He discovered this hidden camera when VICTIM 3's cellphone connected to it by Bluetooth, and he discovered images of himself. He confronted PURDY, who apologized and said he would not do it again.

44.    In total, 12 boys disclosed that PURDY sexually molested them while he was in Tonga – either for his mission, or there teaching, or both. Two more disclosed that PURDY had attempted to molest them, telling one of the boys he would video record the assault in order to sell it for money for PURDY and the boy.

45.    On July 16, 2025, a Grand Jury in the District of Utah charged PURDY with two counts of violating 18 U.S.C. § 2251 (Production of Child Pornography) and one count of violating 18 U.S.C. § 2423(b) (Travel with Intent to Engage in Illicit Sexual Conduct).  On September 10, 2025, a Grand Jury in the District of Utah charged PURDY in a superseding indictment with an additional seventeen counts of 18 U.S.C. § 2423(c) (Engaging in and Attempting to Engage in Illicit Sexual Conduct in Foreign Places).

   D.    _There Is Probable Cause to Believe the Items Listed in Attachment B Will Be Located in the SUBJECT DEVICES_

46.    On July 24, 2025, HSI and DSS agents arrested PURDY outside his apartment building in Pittsburgh, Pennsylvania, where PURDY had moved to attend law school. On PURDY's person were an Apple MacBook laptop, an Apple iPhone, and an Apple Watch (the SUBJECT DEVICES). Each of these items was seized during the arrest.  They are currently in HSI custody in West Valley City, Utah.

47.    Multiple minor victims in Tonga disclosed PURDY's use of his iPhone as part of the grooming and molestation process, one disclosed that PURDY used his phone to take/try to

take child pornography images of him, and another disclosed that PURDY tried to convince him to let PURDY take sexually explicit pictures of him to sell.

48.    As set forth above, a search warrant was conducted on PURDY's residence in 2023, and digital devices were seized. Thus, it is possible that the SUBJECT DEVICES are new to PURDY since that search warrant. However, there is probable cause to believe that PURDY continues to be in contact with at least one of his minor victims and has continued to send him gifts.

49.    VICTIM 4 was a student of PURDY's when PURDY taught school in Tonga. VICTIM 4 subsequently stayed at or lived with PURDY at multiple residences. In a child forensic interview of VICTIM 4 conducted in June 2025, he disclosed that over the course of several years, PURDY sucked VICTIM 4's penis repeatedly and forced VICTIM 4 to suck PURDY's penis. PURDY repeatedly paid VICTIM 4 $50 TOP (Tongan currency), sometimes $100 TOP, and one time $200 TOP in exchange for these sexual acts. PURDY also bought numerous items of value for VICTIM 4, including cellphones, clothing and expensive designer basketball shoes, and PlayStation games in exchange for PURDY sucking VICTIM 4's penis.

50.    VICTIM 4 indicated that he and PURDY communicated via Facebook. Then, for a number of months, PURDY stopped communicating with him. Later, PURDY told VICTIM 4 to delete all their Facebook messages.

51.    In August 2025, Amazon provided law enforcement with PURDY's purchase records. Investigators found that on March 7, 2025, PURDY ordered gifts, including a Sony PlayStation 5 and personal hygiene products, for shipment directly to VICTIM 4, now living in New Zealand. These gifts were provided after PURDY was well aware that he had been charged

for crimes against one minor in Tonga and that he was under investigation by law enforcement in the United States.

52.    Thus, there is probable cause to believe that even if the SUBJECT DEVICES were obtained by PURDY after he returned to the United States from Tonga, and after the search of his home in 2023, they may still contain evidence of the SUBJECT OFFENSES.

53.    Further, the SUBJECT DEVICES are all Apple products.  I know, based on my training and experience, that Apple devices are commonly backed up to online cloud storage. When a new Apple device is purchased, the user commonly populates the new devices by downloading the content of the old devices from that online backup.  This means that there is probable cause to believe that evidence may be on the SUBJECT DEVICES even if they were purchased after PURDY's offenses occurred.  This could be true even though law enforcement already searched the devices found in PURDY's home in 2023; at that time PURDY knew he was under investigation from Tonga.  PURDY was not arrested until two years later.  He had enrolled in law school and could well have thought he was no longer at risk of being arrested.

54.    Agents know that indicia of identity, such as the assumed identity used by PURDY can be contained and stored on digital devices such as computers and mobile devices (cellphones), which can be on their person, in their vehicles and/or in their residence. Furthermore, computers and mobile devices are high in both utility and value while physically small and very portable.

55.    PURDY has a sexual interest in children. As previously discussed, agents know that persons with a sexual interest in children will often show to a child adult or child pornography as a tool used to "groom," or lower the inhibitions of children who they wish to sexually abuse, or to screen children while in search of a possible child victim. Such persons maintain their

26

collections of pornography in safe, secure, and private locations, such as their residence or vehicle, and on computers and digital storage media under their direct control. Also, multiple victims, including VICTIM 4, disclosed that PURDY displayed pornography to them while sexually abusing them.

56.     Therefore, there is probable cause to believe that digital evidence of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES.

## LABORATORY SETTING MAY BE ESSENTIAL FOR COMPLETE AND ACCURATE ANALYSIS OF DATA

57.     Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Therefore, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

58.     Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was

last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the users accessed or used other programs or services in the relevant time-period, can help determine who was sitting at the keyboard.

59.    *Latent Data*: Searching digital devices can require the use of precise scientific procedures designed to maintain the integrity of the evidence and to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

60.    *Contextual Data*:

a. In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

b. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems

can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence.

       c.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software, may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

## SEARCH PROCEDURE

61.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following

procedure:

      a.     To the extent the SUBJECT DEVICES are not already in a location with an appropriate law enforcement laboratory, they will be transported to an appropriate law enforcement laboratory for review.

      b.     Law enforcement personnel will examine the SUBJECT DEVICES to extract and seize any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B. To the extent they discover data that falls outside the scope of the warrant that they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an additional warrant.

      c.     Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

      g.     If any of the original SUBJECT DEVICES do not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that device to PURDY or his designee within a reasonable time following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

      //

## **CONCLUSION**

62.     Based upon the foregoing, I have probable cause to believe that William James

PURDY committed the SUBJECT OFFENSES and that contraband and evidence, fruits, and

instrumentalities of those violations, as described in Attachment B, will be located at the on the

SUBJECT DEVICES, as described in Attachment A.


*/s/   Jeffrey Chmielewski*_____
                    JEFFREY M. CHMIELEWSKI
Special Agent
Homeland Security Investigations


        Sworn to before me telephonically or by other reliable means pursuant to Fed. R. Crim.

P. 4.1 at 9:30 am on September 12, 2025.

HONORABLE Dustin Pead
United States Magistrate Judge